IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.   4:16cr16 |
| | ) | |
| EDWARD JOSEPH MATISH III, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO SUPPRESS</u>

Now comes the United States of America, by and through attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Kaitlin C. Gratton, Assistant United States Attorney, and submits its response to the defendant, EDWARD JOSEPH MATISH III's Second Motion to Suppress statements he made on August 14, 2015 during a voluntary polygraph examination following an advisement of rights. For the reasons set forth below, the defendant's motion should be denied.

## **INTRODUCTION**

The defendant was identified through a months-long investigation as a user of Playpen, a hidden service operating on "The Onion Router" ("Tor"), an anonymous Internet network. After identifying the defendant, FBI agents obtained and executed a search warrant at his home in Newport News, Virginia. Approximately two weeks after the execution of that search warrant, the defendant appeared at the FBI office in Newport News for a pre-scheduled polygraph examination.   The defendant was advised of his *Miranda* rights prior to the examination and also signed a consent form related to the examination, itself.   Following the examination, the

1

defendant made various written and verbal statements confirming that he had been active on the Playpen website.   The defendant now seeks to suppress those statements.   For the reasons that follow, his motion should be denied.

## BACKGROUND

The charges in this case arise from an investigation into Playpen, a global online forum through which registered users (including the defendant) advertised, distributed, and/or accessed illegal child pornography.   The scale of child sexual exploitation on the site was massive: more than 150,000 total members created and viewed tens of thousands of postings related to child pornography.   Images and videos shared through the site were highly categorized according to victim age and gender, as well as the type of sexual activity.   The site also included forums for discussion of all things related to child sexual exploitation, including tips for grooming victims and avoiding detection.

In February 2015, the FBI identified an IP address associated with Playpen user "Broden" and then traced that IP address to Edward Matish III.[1]   One July 23, 2015, FBI Task Force Agent Heather Call ("TFA Call") obtained a residential search warrant for Matish's home from The Honorable United States Magistrate Judge Tommy E. Miller.   Agents executed the warrant at Matish's home on July 29, 2015.   Matish was present and was advised of the identities of the agents and the purpose of the search.   He was further advised that he was free to leave while the search was being conducted and that he did not have to speak with agents.   After receiving these advisements, Matish agreed to be interviewed.   Among other things, Matish stated that he was familiar with the Tor network and acknowledged downloading the Tor browser.   Matish denied

---

[1] The process through which the FBI obtained this information is the subject of Matish's First Motion to Suppress. (ECF 18).

ever creating an account on any Tor site or using the Tor network to view child pornography. Matish further denied ever using the user name "Broden."   During this interview, Special Agent Jack Moughan read Matish a post made to Playpen on December 29, 2014 by the user "Broden."[2] At that time, Matish said that he did not recall making the post, but did acknowledge that the post described his situation, as he had, until the day prior to the search, been employed as an event coordinator at a local resort.   Matish maintained that he had never done anything illegal and had never had inappropriate sexual contact with a child.   During the interview, Matish provided a very brief description of one incident of sexual contact he had experienced when he was seven or eight years old.   As the discussion continued, Matish ultimately acknowledged that he had started looking at "stuff" on the Internet in September 2014, after he ended a relationship.   Matish said that one of the sites he went to was Playpen.   At that time, he denied having ever logged in to the website and insisted that he had "clicked out" right away, after seeing "two little girls in suggestive poses."

During the July 29, 2015 interview, Matish indicated his willingness to take a polygraph examination.   An examination was later scheduled for August 14, 2015.   On that date, Matish voluntarily appeared at the FBI, Peninsula Resident Agency in Newport News, Virginia for the pre-scheduled polygraph examination.   Matish arrived just after 8:30 a.m.   He was welcomed by the case agent, TFA Call, who escorted him to the polygraph examiner, Special Agent Kim A. Wright ("SA Wright").   After showing Matish to the room in which the polygraph examination was to be conducted, TFA Call left the room and returned to her office.   SA Wright remained in the room with the defendant.   The door was closed, but not locked.

---

[2] A copy of the language included in that post is attached as Gov't Ex. 5.

SA Wright began by showing Matish an FD-395, "Advice of Rights Form," which was read to him as he followed along.[3]   Matish indicated that he understood his rights and signed the form agreeing to the same.   SA Wright then showed Matish an FD-328, "Consent to Interview with Polygraph" form, which was also read aloud to him as he followed along.[4]   Matish acknowledged that he understood the advisements included in this form and then signed the form.

Following these advisements, SA Wright conducted a pretest interview, a standard component of any polygraph examination.   This interview lasted approximately 50 minutes. During the pretest interview, Matish discussed his prior and current romantic relationships, the nature and extent of his prior sexual activity, and his sexual preferences.   He described ending a relationship in September 2014 and stated that he was mentally distraught for a period of approximately two-and-a-half to three months after the breakup, describing that period as very "fuzzy" to him.   SA Wright asked Matish about his statements concerning his interaction with a babysitter when he was seven or eight years old.   Matish advised SA Wright that he did not consider himself a victim, because the interaction was "purely consensual."   SA Wright also asked Matish about his prior job as an event coordinator at a resort.   Matish stated that he planned activities and handed out towels at the pool, but maintained that he was never alone with children.

Following the pretest interview, SA Wright administered a practice test to acquaint Matish with the components of the examination.   During this test, she discussed with him the theory of a polygraph examination.   For the practice test, SA Wright asked Matish to write a number down and then lie to her about the number, so that she could test his physiological response.   After the pretest, SA Wright conducted the polygraph examination on two relevant questions concerning

---

[3] A copy of this form, signed by the defendant, is attached as Gov't Ex. 1.   The summary that follows is based on SA Wright's Polygraph Examination Report, FD-498, a copy of which is attached as Gov't Ex. 2, as well as on the testimony SA Wright would provide concerning the August 14, 2015 polygraph examination, if called.

[4] A copy of this form, signed by the defendant, is attached as Gov't Ex. 3.

whether Matish had ever had any sexual contact with a child or physically touched a child for sexual pleasure.   SA Wright ran four charts as part of this examination, each of which lasted approximately two minutes.   SA Wright concluded the examination at approximately 10:00 a.m. At that time, the polygraph equipment was removed.

SA Wright conducted a post-test interview following the exam. During that interview, Matish agreed that, if computer evidence showed that his computer had created an account on Playpen, then he must have created it.   Matish stated, however, that he did not recall doing so. Matish then asked SA Wright if he could type a statement. SA Wright provided Matish her examiner's laptop, on which he typed the following statement:

> I, Edward Matish, III, am voluntarily providing the following information regarding possible accounts set up on the internet through TOR:
>
> There is a 3 month period between September 2014 and November 2014 where I was in a state of extreme emotional distress and my memory is fuzzy.   Though I do not believe I had done anything other than attempted suicide a few times, it is entirely possible that I could have made an account in that time period and have no recollection of doing so.   I know I was acting like a different person at that point in time, so I can not deny any evidence brought against me from that time period.

Gov't Ex. 4 (copy of the defendant's entire typed and signed statement).   Matish signed this statement, but continued to tell SA Wright that he was trying to remember as much detail as possible so that he could cooperate.   SA Wright briefly left the room to retrieve screenshots of the Playpen website to show Matish.   When she returned a few minutes later, she informed Matish of the date that "Broden" Playpen account had been created.   SA Wright also provided Matish with a copy of the text representing the post made to Playpen from the Broden account on December 29, 2014, as well as a screen shot of a Playpen thread printed from that account.   Matish stated that the December 29, 2014 posting "sounded like him" and indicated that he was "beginning to recall it." At that point, Matish added the following additional paragraphs to his typed statement:

After being informed that computer analysis indicates that the PlayPen account was created on 10/21/2014, as well as reading the post made by me and seeing a screenshot of the website, Much [sic] of it comes back to me.   I can't remember the images and honestly do not want to.   But I can now confirm I was on that site.   It hurts my head to think back on it, but I can remember it.   I do not know whether I spent 7 hours on the site, but I can remember it.   I do specifically remember the post.   Reading the post in its entirety as presented by Agent K.A. Wright brought the memory back.   I feel horrible about all of this, but if I remember anything else of importance or use to the investigation, I will immediately call Detective Call.   I still cannot remember much in the way of specifics, but I can now confirm what happened.   It might be worth stating that I had repressed the memories of this website.   It was difficult to recall the details, and I never meant to withhold any information.

Agent K.A. Wright has been professional and fair to me.   I have not been threatened in any way during this interview.   No promises of any kind have been made to me in exchange for my information.   I have re-read this statement and it is accurate and correct to the best of my knowledge.

Gov't Ex. 4.   Matish and SA Wright signed the completed statement.   Matish then reviewed and signed a copy of the text from the December 29, 2014 posting to Playpen from the Broden account. Consistent with their discussions, SA Wright wrote on the bottom of the page: "Edward Matish acknowledges that this text represents the posting he typed on Play Pen on Dec. ~~26~~ (initialed by SA Wright and Matish) 29, 2014 using the user name 'Broden'."   Gov't Ex. 5 (copy of posting with handwritten statement and signatures).   Matish and SA Wright each signed below this statement.

Once Matish finished his statement, SA Wright again left the room to retrieve TFA Call. TFA Call joined SA Wright and Matish in the examination room and reviewed the statement in the presence of Matish and SA Wright.   TFA Call did not further question Matish concerning its contents or his activity on the Playpen site.   She did inquire whether Matish felt he would harm himself.   Matish stated that he would not, but did ask if TFA Call knew of any good therapists. TFA Call advised Matish to contact Social Services for a referral upon learning that he was uninsured.   TFA Call provided him directions to the Social Services office.   Matish indicated

that he would go to that office after leaving the FBI office.   Matish was then escorted out of the office, approximately sometime between 12:15 and 12:30 p.m.

If called to testify, both TFA Call and SA Wright will describe Matish's demeanor throughout his interactions with them on August 14, 2015 as "calm," "cooperative," "polite," and "very cordial."   SA Wright will testify that Matish was reflective during their conversations and appeared to carefully consider his words.   SA Wright will also testify that, at no point, did Matish tell her that he wanted to leave; that he was never told that he had to make a statement; and that no one threatened to prosecute him or his family if he failed to provide a statement.   SA Wright will further testify that Matish asked to type a statement, that she provided him her laptop to do so, and that she did not tell him what to include in that statement.

## **LEGAL STANDARD**

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law."   U.S. Const. amend. V.   The admissibility of a defendant's statement depends on whether that statement was voluntarily made.   *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).   "A statement is involuntary under the Fifth Amendment only if it is "involuntary within the meaning for the Due Process clause."   *Id.* (citing *Oregon v. Elstad*, 470 U.S. 298, 304 (1985)).   "The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."   *Id.* (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (alterations in original)) (internal quotation marks omitted).   The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."   *Colorado v.*

*Connelly*, 479 U.S. 157, 167 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. *Braxton*, 112 F.3d at 780. The crucial inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Id.* at 780-81 (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). To resolve this question, courts are required to consider "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*; *see also United States v. Cristobal*, 293 F.3d 134, (4th Cir. 2002).

## ARGUMENT

As a threshold matter, the statements at issue were made following an oral and written review of the defendant's rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). As a general matter, statements made following such *Miranda* warnings will "rare[ly]" be deemed involuntary. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). Further, the existence of some coercive police activity is a condition precedent to a finding of involuntariness. *Connelly*, 489 U.S. at 165. The defendant makes a number of claims concerning the manner in which the August 14, 2015 polygraph examination transpired, all of which he argues satisfy this condition precedent and, accordingly, render the statements he made following an advisement of his rights involuntary. But, none of these claims is supported by the evidence available to the government and the defendant has not identified any evidence he contends will support the allegations he makes concerning the agents' conduct during the examination. Based on the evidence available to the government, which is attached as Gov't Exhibits 1 through 5 and summarized above in the proffered testimony, the defendant's August

8

14, 2015 statements were clearly voluntary, as can certainly be established by a preponderance of the evidence. *See Braxton*, 112 F.3d at 781.

**I. FBI agents never threatened to prosecute Matish or his family in the event that he failed to provide a statement.**

First, there is no record related to the defendant's August 14, 2015 polygraph examination indicating that SA Wright or TFA Call ever discussed with him *any* possible prosecution, let alone one tied to his alleged reluctance to provide a statement. Rather, all reports make clear that the focus of the interview was the completion of a polygraph examination, including standard pre- and post-test interviews. At no point was the defendant threatened in any way.

The defendant voluntarily appeared at the FBI's office on August 14, 2015, having previously agreed to take a polygraph examination and scheduling that examination with case agents. On arrival, the defendant was advised of his rights, including his right to remain silent. Gov't Ex. 1. The defendant was also advised of the purpose of the examination, his "right to refuse to take the polygraph test," his "right to stop the test at any time," and his "right to refuse to answer any individual question." Gov't Ex. 2. As part of the waiver and consent he signed prior to beginning the polygraph examination, the defendant acknowledged that he understood these rights, that he "voluntarily agree[d] to be examined by means of the polygraph," and that he "understood and kn[e]w what [he was] doing." *Id.* The defendant also affirmed that "[n]o threats or promises ha[d] been used against [him] to obtain [his] consent to use the polygraph." *Id.*

Importantly, the reports and anticipated testimony concerning the examination that followed make clear that no threats or promises of any kind were made to the defendant, either

9

by the examiner, SA Wright, or the case agent, TFA Call.   Indeed, the defendant affirmed the same at the conclusion of the examination, when—in the written statement that *he* asked to type—he stated that "Agent K.A. Wright has been professional and fair to me" and affirmed that he "ha[d] not been threatened in any way during this interview" and that "[n]o promises of any kind ha[d] been made to [him] in exchange for [his] information."   Gov't Ex. 4.   SA Wright's report of the examination corroborates these affirmations, in that it is devoid of any discussions of threatened prosecutions or promised outcomes.   Gov't Ex. 2.   Additionally, if called to testify, SA Wright and TFA Call will each confirm that no such discussions occurred at any point on August 14, 2015.

In short, there is simply no evidence that *any* threats were made against the defendant before, during, or after his polygraph examination on August 14, 2015.   That said, even if the agents had discussed with him possible prosecutions, that fact alone would not be sufficient to render his statements involuntary.   The circumstances surrounding an interrogation or interview need not be entirely free of intimidation for a defendant's statements to be voluntary.   *Braxton*, 112 F.3d at 780-82; *Pelton*, 835 F.2d at 1072.   "Truthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (approving the practice of warning a subjection of additional charges and penalties he may face for making false statements to interviewing agents or officers); *accord United States v. Mashburn*, 406 F.3d 303, 309-10 (4th Cir. 2005) (advising a defendant of the penalties he faced if convicted and telling him that the only way to help himself was to accept responsibility and cooperate was not an impermissible implied threat or promise); *Pelton*, 835 F.2d at 1072-73 ("Truthful statements about Pelton's predicament are not the type of 'coercion' that threatens to render a statement involuntary."); *United States v. Shears*, 762 F.2d 397, 401

(4th Cir. 1985) ("[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary.").

## II.     There is no evidence that FBI agents engaged in any coercive police activity that could render Matish's statements involuntary.

There is also no evidence that FBI agents engaged in any other coercive activity or "overreaching" that might render the defendant's August 14, 2015 statements involuntary.   *See Cristobal*, 293 F.3d at 141.   The defendant does not allege that he was subjected to any gross abuse of a type that might "easily" render a confession involuntary.   *Id.* at 140.   For example, the defendant does not claim that he was subject to any physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936); held and questioned for dozens of hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944); given a "truth serum," *see Townsend v. Sain*, 372 U.S. 293 (1963); or threatened with a loaded gun while wounded, *see Beecher v. Alabama*, 389 U.S. 35 (1967).   Instead, the defendant alleges that he asked to leave and was not permitted to do so, that he was directed to provide a statement, and that officers "fed" him the information they wanted him to include in that statement.   Def.'s Second Mot. to Supp. at 2-3 (ECF 19).

Like the alleged threats of prosecution, there is no evidence of which the government is aware that supports the defendant's allegations.   The defendant was advised at the outset of the August 14, 2015 examination that he was not required to participate in the exam, that he did not have to speak with agents or the examiner, and that he could stop at any time.   Gov't Ex. 1, 3. The defendant affirmed his understanding of these rights and agreed to proceed with the examination.   *Id.*   As proffered above, at no time did the defendant express a desire to terminate the examination or leave the FBI office.   Similarly, the defendant was never told to make a statement.   On the contrary, the consent he signed to proceed with the examination

made clear that he could refuse to answer any question.   Gov't Ex. 3.   Additionally, the advisement of rights he received at the examination also made clear that he could remain silent, consult with an attorney before and during questioning, and that he could "stop answering" questions "at any time."   Gov't Ex. 1.   Nothing in the record indicates that the defendant ever sought to exercise these rights or that SA Wright or TFA Call attempted in any way to prevent or dissuade him from doing so.

Similarly, although the defendant did make verbal and written statements during the examination, including the pre- and post-test interviews, nothing suggests that he did so at the direction or urging of the agents.   On the contrary, the defendant voluntarily appeared for the examination, which he had scheduled in advance.   He was advised that he did not have to participate in the examination and that he did not have to say anything to the agents. Gov't Ex. 1, 3   As reflected in SA Wright's report, the defendant asked to provide a typed statement during the early stages of the post-test interview.   Gov't Ex. 2.   The defendant typed the first paragraph and signed that statement.   He then continued to indicate to SA Wright that he was trying to remember as much detail as possible and expressed a desire to be as cooperative as possible.   *Id.*   At that point, SA Wright left the room and retrieved limited information concerning Playpen from TFA Call, which she showed to the defendant.   The defendant advised her that, upon seeing these items, he was "beginning to recall it."   *Id.*   The defendant then added to his previous statement, affirming that he had accessed and posted to Playpen as the user "Broden."   Although SA Wright showed the defendant the screenshots, there is no evidence that she directed him to add to his statement or dictated the contents of any part of that statement. Indeed, the defendant wrote that SA Wright had "been professional and fair" to him.   Similarly,

if called to testify, SA Wright would describe the defendant throughout her interactions with him as "very cordial," "cooperative," and "polite."

The only time SA Wright participated in the preparation of any statement on August 14, 2015 was when she wrote a notation on the bottom of the December 29, 2014 posting, stating—consistent with her discussions with the defendant—that he acknowledged that the text represented a posting he had typed on Playpen as the user "Broden."   Gov't Ex. 2.   SA Wright did this after the defendant had completed and signed his type statement.   *Id.*   And, the defendant signed and initialed this notation.   TFA Call took no part in the polygraph examination and returned to the room only to review the statements made by the defendant. She did not question him at all, except to ask whether he felt he might harm himself.   She then provided him with information on how and where to obtain therapy.

In short, nothing about the defendant's August 14, 2015 polygraph examination establishes a "substantial element of coercive police conduct." *Connelly*, 479 U.S. at 163-64.

**III.     Absent the necessary predicate of coercive police activity, the totality of the circumstances does not support the conclusion that Matish's statements—made after he was advised of and acknowledged his constitutional rights and other rights afforded to him in the context of the polygraph examination—were involuntary.**

When determining whether a defendant's statement was involuntary, the Court must, of course, consider the totality of the circumstances, "including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."   *Cristobal*, 293 F.3d at 140. The defendant claims that a number of factors "conspired to overcome [his] will" during the August 14, 2015 polygraph examination, including his inexperience, age, maturity, and history of claimed mental health problems and abuse.   Def.'s Second Mot. to Supp. at 6.

As a threshold matter, at the time of the examination—as reflected in the defendant's written and signed statement—he reported having been in a state of extreme emotional distress between September 2014 and November 2014, nine months prior to the polygraph examination. Gov't Ex. 4.   At no time did he claim to suffer ongoing mental health problems and, at the end of the examination, he specifically disclaimed wanting to harm himself.   Gov't Ex. 2. Although he did indicate having some difficulty recalling the details of his activity on Playpen, the defendant explained that he had repressed his memories of the website.   *Id.*   When asked about the alleged abuse he had described during his July 29, 2015 interview, the defendant told SA Wright that he did not consider himself a victim and described the encounter as to her "purely consensual."   *Id.*   None of the information that the defendant provided to agents suggested that he was, at any point on August 14, 2015, in a "weakened state."   Def.'s Second Mot. to Supp. at 7 (ECF 18).   On the contrary, as both SA Wright and TFA Call will testify, he appeared "calm," "cooperative," "very cordial," and "polite" throughout their interactions with him on that date.

Although the Court should consider the characteristics of the defendant when assessing the voluntariness of his statements, his alleged vulnerability—alone—is not enough to render those statements involuntary.   "[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment is not, without more, enough to render a waiver [or statement] involuntary."   *Cristobal*, 293 F.3d at 141 (citing *Connelly*, 479 U.S. at 164-65).   "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."   *Connelly*, 479 U.S. at 165.   The ultimate focus must be "on the actions of the law enforcement officials to determine

if police overreaching occurred," that is whether "law enforcement officials exploited [the confessant's] weakened condition with coercive tactics."  *Cristobal*, 293 F.3d at 141 (citing *Connelly*, 479 U.S. at 165).

As stated above, the defendant was not threatened with any harm—including prosecution—if he did not waive his rights and provide a statement.   In fact, SA Wright did not pressure him in any way to waive his rights.   Rather, she was careful to review those rights with him and affirm his understanding of them before proceeding.   The defendant never asked to leave and did not express a reluctance to provide a statement.   Neither SA Wright nor TFA Call directed the defendant to make a statement or dictated what the statement he chose to provide should include.   As in *Cristobal*, "[t]his is simply not a case where law enforcement has attempted to 'wring[] a confession . . . out of an accused against his will.'" 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)); *accord United States v. Holmes*, 670 F.3d 586, 591-93 (4th Cir. 2012).

The result is the same even when the "length, location, and continuity of the interrogation" are considered.   The August 14, 2015 polygraph examination was, from start to finish, approximately between three-and-a-half and four hours.   The examination was conducted in a room at the FBI.   However, at no time was the door locked.   The record and proffered testimony make clear that the examination included two separate advisements of rights; a pre-test interview; a practice test; the examination itself, which included four separate charts; and a post-test interview.   In addition to substantive discussions, time was spent reviewing the components of the examination and the theory of polygraphs and connecting and disconnecting the defendant from the polygraph machine.   Gov't Ex. 2.   Additionally, SA Wright left the room on at least two occasions, first to obtain certain screenshots from TFA Call, and later to

15

notify TFA Call that the examination was coming to an end.   In light of the various components of the polygraph examination and the time it took to transition from one to the next, the August 14, 2015 examination was, in reality, a far cry from the "lengthy hours-long," "non-stop" "interrogation" under lock and key that the defendant baldly asserts.   Def.'s Second Mot. to Supp. at 7 (ECF 18).   Under the totality of the circumstances, the setting and details of the exam simply do not evince an encounter that, by its nature, was so fraught with government coercion as to render the statements the defendant made after being advised of his rights involuntary.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's second motion to suppress the statements he made on August 14, 2015 during a voluntary polygraph examination following an advisement of his rights should be denied.

Respectfully submitted,

DANA J.   BOENTE
UNITED STATES ATTORNEY


By:        _____/s/_____
           Kaitlin C.   Gratton
           Assistant United States Attorney
           Virginia State Bar Nos.   83935
           Fountain Plaza Three, Suite 300
           721 Lakefront Commons
           Newport News, VA 23606
           Phone: (757) 591-4000
           Fax: (757)591-0866
           Email: kaitlin.gratton@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of April, 2016, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic

notification of such filing to the following:

      Andrew W.   Grindrod
      Assistant Federal Public Defender
      Office of the Federal Public Defender
      150 Bousch Street, Suite 403
      Norfolk, Virginia 23510
      Andrew_Grindrod@fd.org

                        _____/s/_____
                        Kaitlin C.   Gratton
                        Virginia State Bar No.   83935
                        Assistant United States Attorney
                        Attorneys for the United States
                        United States Attorney's Office
                        Fountain Plaza Three, Suite 300
                        721 Lakefront Commons
                        Newport, VA 23606
                        Phone: 757-591-4000
                        Email: kaitlin.gratton@usdoj.gov

17