IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES of AMERICA,

v.  Criminal No. 4:16cr16

EDWARD JOSEPH MATISH, III,

Defendant.

## OPINION & ORDER

This matter is before the Court on Defendant Edward Matish, III's ("Defendant" or "Matish") Second Motion to Suppress ("Second Motion"). Doc. 19.

On February 8, 2016, Defendant was named in a four (4) count criminal indictment charging him with access with intent to view child pornography, in violation of 18 U.S.C. § 2252A(a)(5) and (b)(2). Doc. 1. The Government filed an eight (8) count superseding indictment on April 6, 2016, charging Defendant with access with intent to view child pornography, in violation of 18 U.S.C. § 2252A(a)(5) and (b)(2) (Counts One through Four), and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) (Counts Five through Eight). Doc. 26. Defendant filed the instant Motion on March 17, 2016, Doc. 19, and he adopted it after the Government filed the superseding indictment on April 8, 2016, Doc. 30. The Court held a hearing to address this Motion on May 26, 2016.

Defendant seeks the suppression of "involuntary statements made by Mr. Matish during an FBI interrogation on August 14, 2015." Doc. 19. For the reasons stated herein, the Court **DENIES** Defendant's Second Motion, Doc. 19.

1

## I. FACTUAL BACKGROUND

At the hearing on May 26, 2016, the Court heard testimony from two witnesses for the Government, Special Agent ("SA") Jack Moughan and SA Kim Wright. The Court also admitted several Government exhibits. See Gov't Ex. 1, 2, 3, 4, 5. Doc. 66. Defendant offered no additional evidence. The Court **FOUND** the testimony of the Government's witnesses credible.

On July 29, 2015, the FBI conducted a residential search of Defendant's home, pursuant to a search warrant. While other law enforcement officers conducted the search, SA Moughan and FBI Task Force Agent ("TFA") Heather Call interviewed Defendant on his back deck. During this interview, the agents discussed the Tor network with Defendant. According to SA Moughan, Defendant appeared familiar with Tor. Defendant also claimed that he had visited Playpen but denied making an account or viewing child pornography. Defendant also noted, however, that he had difficulties remembering chunks of time. Defendant told the agents that he and his online girlfriend had broken up in the fall of 2014. Additionally, Defendant told SA Moughan and TFA Call that a female babysitter had touched him when he was seven or eight years old. Defendant informed the agents that he had not told anyone about his encounter with his babysitter, including his parents. At the end of the interview, which lasted about forty-five minutes, Defendant agreed to take a polygraph examination.

On August 14, 2015, at or around 8:30 a.m., Defendant reported to the FBI office in Newport News, Virginia, to take a scheduled polygraph examination. SA Wright administered the polygraph examination. To prepare for the examination, she discussed Defendant and his case with TFA Call. The main purpose of the polygraph examination was to determine whether Defendant had committed any hands-on sexual offenses with children. Prior to taking the

2

polygraph examination, Defendant signed an advice of rights form, Gov't Ex. 1, and a consent to interview with polygraph form, Gov't Ex. 2. Defendant did not ask any questions about these forms.

After reviewing the forms, SA Wright conducted a pretest interview with Defendant to ensure that Defendant was suitable for the exam. During the pretest interview, Defendant mentioned his breakup with his online girlfriend in the fall of 2014. He stated that for three months after the breakup, he felt upset and fuzzy. Defendant also discussed his contact with his babysitter when he was seven or eight years old. Defendant told SA Wright that they were playing doctor and that he considered the touching consensual. Defendant was not on any medications at the time of the interview, and he appeared conversational and polite. Reviewing the forms and conducting the pretest interview lasted approximately an hour.

The polygraph examination concluded at or around 10:00 a.m. During the polygraph examination, the door to the room was closed but not locked. After the polygraph examination, Defendant stated that he wished to cooperate and was trying to remember. At this point, SA Wright offered to allow Defendant to make a statement, which Defendant asked to type. Defendant typed one paragraph. Then, SA Wright left the room and received from TFA Call two pieces of paper, which she showed to Defendant upon re-entering the room. One of the papers retrieved by SA Wright recited a posting on Playpen by the user "Broden." See Gov't Ex. 4. The other represented a thread on Playpen. Gov't Ex. 5. After reviewing the posting and the Playpen thread, Defendant stated that he was starting to recall, and he then added a second paragraph. SA Wright testified that she left the room because she did not have the information she retrieved at the start of the interview due to a technical issue with the printer. Defendant acknowledged that he typed the posting, and he signed a statement to that effect written by SA

3

Wright. Gov't Ex. 4. After typing his full statement Defendant reread it, including the pre-prepared first sentence and last paragraph. See Gov't Ex. 3. After Defendant finished his statement, TFA Call entered the room, as is standard practice. She asked Defendant if he felt he would harm himself and provided him with the location of social services.

SA Wright testified that Defendant neither asked to leave nor physically indicated that he wished to leave during the interview. She testified that had Defendant asked or expressed a desire to leave, she would have let him. SA Wright additionally testified that she never discussed any potential criminal prosecution with Defendant. SA Wright knew that Defendant was twenty-three years old, that he had no prior criminal record, and that he had undergone a recent breakup.

The polygraph results were inconclusive as to whether Defendant had ever had sexual conduct with a child.

## II. LEGAL STANDARDS

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . ." U.S. Const. amend. V. The admissibility of a defendant's statement "turns on whether the statement was voluntary under the Fifth Amendment." United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997). Therefore, an involuntary statement made in violation of the Fifth Amendment will be suppressed, whereas any "statement given freely and voluntarily without any compelling influences is admissible in evidence." E.g., id. at 780–81. The Government bears the burden of proving by a preponderance of the evidence that a defendant gave a statement voluntarily. Id. at 781.

Statements are "involuntary under the Fifth Amendment only if [they are] involuntary within the meaning of the Due Process Clause." Id. at 780. The Supreme Court has noted that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 444 (2000). To determine whether a statement is voluntary under the Due Process Clause, courts examine "whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." E.g., Braxton, 112 F.3d at 780 (citing Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542–43 (1897)) (internal quotations omitted). Therefore, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause." Id. (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)); see also United States v. Cristobal, 293 F.3d 134, 141 (4th Cir. 2002) (noting that police overreach is a "crucial element" to consider).

Although courts must find coercive police activity in order to consider a confession involuntary, the "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." Braxton, 112 F.3d at 780; see also United States v. Shears, 762 F.2d 397, 401 (4th Cir. 1985) (noting that "government agents may validly make [or even breach] some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary." Id. at 401–02). Indeed, courts should not equate voluntariness with "the absolute absence of intimidation, for under this test virtually no statement would be voluntary." United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987). Therefore, the police may provide truthful

5

statements about a defendant's predicament – including potential penalties the defendant may face – without inappropriately coercing him to make an involuntary confession. E.g., Braxton, 112 F.3d at 782; see also Haynes v. State of Washington, 373 U.S. 503, 515 (1963) (explaining that the Court does "not mean to suggest that all interrogation of witnesses and suspects is impermissible").

Hence, the "proper inquiry 'is whether the defendant's will has been overborne or his capacity for self-determination critically impaired.'" E.g., Braxton, 112 F.3d at 780–81 (citing Pelton, 835 F.2d at 1071 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973))). To make this determination, "courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Id. While courts thus consider the defendant's mental state at the time of his or her statement, cf. Reck v. Pate, 367 U.S. 433, 440–41 (1961), courts must carefully scrutinize "[s]ubsequent testimony by an accused about his prior subjective mental impressions and reactions, . . . as such testimony is 'always influenced by [his or her] self-interest,'" Braxton, 112 F.3d at 781 (citing United States v. Wertz, 625 F.2d 1128, 1136 (4th Cir. 1980)). However, courts should remain aware that "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." Colorado v. Connelly, 479 U.S. 157, 164 (1986). Although, the Supreme Court in Connelly did clarify that "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Id.

6

### III. ANALYSIS

Defendant stresses Mr. Matish's previous lack of experience with law enforcement, as well as threats from the FBI to prosecute Defendant for impeding or obstructing a federal investigation if he exercised his Constitutional right to remain silent. Doc. 19 at 4–5. Defendant also argues that the FBI threatened Defendant's family members if he declined to make an inculpatory statement by suggesting "that Mr. Matish's family would face criminal charges if he refused to 'admit' what happened." Id. Defendant avers that Mr. Matish's "inability to remember anything regarding his alleged account on Playpen until the agents threatened his family and showed him exactly what it is that he was supposed to remember" supports his argument that the resulting confession was involuntary. Id. at 5. Not only were the police actions coercive, argues Defendant, but it "is clear from the record that [Defendant] was unable to remember any details that were not specifically shown to him by the agents during the interrogation." Id. Thus, Mr. Matish "simply said what he was essentially told to say in order to prevent his family from suffering." Id.

There is no evidence to support Defendant's claim that he made his statement involuntarily. Defendant put on no evidence during the hearing to support the allegations made in his brief. The evidence before the Court shows that the agents never threatened to prosecute Defendant or his family if he did not provide a statement. Although Defendant informed the agents that he had experienced a "fuzzy" period in the fall of 2014, there is no evidence to suggest that Defendant suffered any further emotional distress at the time he took the polygraph examination and made his statement. Given the unchallenged testimony before the Court, the Court **FINDS** that the Government has proved by a preponderance of the evidence that

7

Defendant made his statement voluntarily, even given Defendant's age and inexperience with law enforcement.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Second Motion to Suppress, Doc. 19.

The Clerk is **DIRECTED** to deliver a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May ~~2~~ , 2016
JUNE